**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**CONTINENTAL CASUALTY COMPANY,**

        **Plaintiff/Counterclaim Defendant,**

**v.**                                 **Civil Action No. 3:19cv661**

**AWP USA INC.,**

        **Defendant/Counterclaim Plaintiff.**

**<u>MEMORANDUM OPINION</u>**

This matter comes before the Court on two motions:

(1)    Plaintiff/Counterclaim Defendant Continental Casualty Company's ("Continental") Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c)[1] (the "Rule 12(c) Motion"), (ECF No. 28); and,

(2)    Continental's Motion to Stay Discovery and for Protective Order and Unopposed Request for an Initial Pretrial Conference (the "Motion to Stay") (collectively, the "Motions"), (ECF No. 33).

Defendants and Counterclaim Plaintiffs AWP USA Inc. ("AWP"), AGA Service

Company d/b/a Allianz Global Assistance ("AGA"), and Jefferson Insurance Company

("Jefferson") (collectively, "Allianz")[2] responded to the Motions, (ECF Nos. 31, 36).

Continental replied, (ECF Nos. 32, 37). These matters are ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately

present the facts and legal contentions, and argument would not aid the decisional process. The

---

[1] Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

[2] Both AGA and Jefferson are insured as subsidiaries of AWP under the E&O Policies at issue. (Resp. 10, ECF No. 31.)

Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[3]  For the reasons that follow the Court will grant the Rule 12(c) Motion Counts IV and VII, finding that the Unfair Competition Exclusion bars those Claims "arising out of" a class action "based on" the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The Court will also deny the Rule 12(c) Motion as to all remaining Counts.  The Court also denies as moot the Motion to Stay.

## I.  Factual and Procedural Background

Continental brings this action to determine the Parties' rights and obligations under five insurance policies (the "Policies") that Continental issued to Allianz.  (Resp. 3–4.)  During the respective coverage periods, Allianz submitted eleven claims to Continental for coverage under the Policies.  (*Id.* 4–5.)  Continental argues, for the three reasons detailed below, that Allianz's Claims are barred from coverage under the Policies.

---

[3] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  "Continental is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois, and is therefore a citizen of Illinois."  (Compl. ¶ 3, ECF No. 1.)  "AWP USA Inc. is a corporation organized and existing under the laws of the District of Columbia, with its principal place of business in Richmond, Virginia, and is therefore a citizen of the District of Columbia and Virginia."  (*Id.* ¶ 4.)  The Complaint alleges damages exceeding $75,000.  (*Id.* ¶ 5.)

A.      **Factual Background**[4]

In the course of its regular business, Allianz "sells its insurance products through various partners."  (Resp. 3, ECF No. 31.)  In turn, "[t]hose partners, frequently in the travel industry, provide a platform through which customers have the option to protect their [tickets] by purchasing insurance backed by [Allianz]."  (*Id.*)  Allianz and its partners formalize these business relationships through marketing agreements that, "among other things, establish certain indemnity obligations in the event of a third-party claim."  (*Id.*)  Over the course of the policy periods, Allianz received various claims for indemnification pursuant to its marketing agreements.  (*Id.* 4–7.)  Additionally, in 2019, Allianz's subsidiaries submitted Claims to Continental for direct demands made against them.  (*Id.* 8–9.)  Allianz sought coverage for these claims under the Policies issued by Continental.  (*Id.*)

1.      **The Relative Policies and Terms**

To cover "third-party claims" against it, Allianz purchased cyber ("EPS") and errors and omissions ("E&O") insurance from Continental over several years.  (Resp. 1.)  First, for the period of May 1, 2016, through May 1, 2017, Continental issued Allianz two different insurance policies:  a cyber policy (the "EPS Policy") and an errors and omissions policy (the "E&O Policy") (collectively, for that policy period, the "2016–17 Policies" and generally, the "Policies").  (*Id.* 3.)  Both qualified as "claims-made" policies, such that the Policies would

---

[4] "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)."  *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Accordingly, a motion for judgment on the pleadings "should only be granted if, after accepting all well-pleaded allegations in the [nonmoving party's pleadings] as true and drawing all reasonable factual inferences from those facts in the [nonmoving party's] favor, it appears certain that the [non-moving party] cannot prove any set of facts in support of his claim[.]"  *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

respond to any claims first asserted against Allianz during that policy period.  (*Id.*)  Continental

renewed the Policies without modification for the 2017–18 policy period.  (*Id.* 4.)  Again, at the

end of the 2017–18 and 2018–19 policy periods, Continental renewed the Policies issued to

Allianz.[5]  (*Id.* 4–5.)

<strong>a.</strong>   <strong><u>The EPS Policies</u></strong>

The EPS Policies contain Media Liability coverage, which carries a $10,000,000 per

policy year limit, with a $250,000 retention.  (*See* Compl. Ex. 1 "2016–17 EPS Policy" 1, ECF

No. 1-1; Compl. Ex. 3 "2018–19 EPS Policy" 1, ECF No. 1-3.)[6]  The Media Liability coverage

provides, in relevant part:

> [T]he Insurer will pay on behalf of the Insured all sums, in excess of the retention
> and up to the applicable limit of liability, that the Insured shall become legally
> obligated to pay . . . as Damages and Claim Expenses resulting from liability
> imposed by law or Assumed Under Contract resulting from any Claim first made
> against the Insured during the Policy Period . . . alleging Wrongful Acts by the
> Insured, or by someone for whose Wrongful Acts the Insured is legally liable . . . .

2016–17 EPS Policy § I(A)(2).

The EPS Policies cover liability imposed by law or assumed under a contract, including

"liability of others, for Matter furnished by the Insured, that the Insured agrees to assume under a

hold harmless or indemnity agreement but only to the extent such liability arises out of any

Wrongful Act."  *Id.* § II.  The EPS Policies also cover assumed liability, specifically:

> The Insured Entity is insured for liability it assumes in a written contract or
> agreement under which it assumes the tort liability (liability that would be imposed
> by law in the absence of any contract or agreement) of another party incurred by
> such third party as a result of an Insured's Wrongful Act provided the Wrongful

---

[5] For the 2019–20 policy period, Allianz engaged a new cyber insurer and accordingly
did not renew its EPS Policy with Continental for that period.  (Resp. 6 n.5.)

[6] Because Continental and Allianz renewed the 2016–17 EPS contracts without
amendment, the Court cites to the original 2016–17 EPS Policy sections for clarity and to avoid
duplicity of citation.

Act gives rise to a Claim and occurs subsequent to the execution of such contract or agreement.

*Id.* § I(E)(2).

A "Claim" under the EPS Policies includes "a written demand . . . for monetary damages or non-monetary relief, including a demand for injunctive or declaratory relief." *Id.* § II. Specifically, "Covered Wrongful Acts" include "the dissemination or utterance of Matter, through any medium and by any means, including blogging, tweeting or other forms of online, digital or electronic dissemination . . . that results in . . . negligence in connection with the content of Matter." *Id.* Matter includes

> any content regardless of its nature or form" that results in, among other things, "unfair competition or unfair trade practices . . . including but not limited to dilution, confusion, deceptive trade practices or unfair trade practices, civil actions for consumer fraud, false, disruptive or misleading advertising or misrepresentation in advertising.

*Id.*

The EPS Policies require that "Related Claims" be aggregated under a single policy period:

> If Related Claims are subsequently made against the Insured and reported to the Insurer, all such Related Claims, whenever made, shall be considered a single Claim subject to the limit of liability applicable to the earliest such Claim first reported to the Insurer.

*Id.* § V(D)(1). The EPS Policies define Related Claims as "all Wrongful Acts that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision" (the "EPS Policy Related Claims Provisions"). *Id.* § II.

### b.   The E&O Policies

Continental issued three E&O policies to Allianz:

(1)    the 2016–17 E&O Policy with effectives dates of May 1, 2016, through May 1, 2017, (Compl. Ex. 2 "2016–17 E&O Policy," ECF No. 1-2);

(2)      the 2018–19 E&O Policy with effective dates of June 30, 2018, through June 30, 2019, (Compl. Ex. 4 "2018–19 E&O Policy," ECF No. 1-4); and,

(3)      the 2019–20 E&O Policy with effective dates of June 30, 2019, through June 30, 2020, (Supp. Compl. Ex. 10 "2019–20 E&O Policy," ECF No. 25-1) (collectively, the "E&O Policies").[7]

AGA and Jefferson were insured as subsidiaries of AWP under these policies.  (*Id.*)

The 2016–17 E&O Policy carries a $10,000,000 per policy year Limit of Liability while the 2018–19 and 2019–20 E&O Policies each carry a $5,000,000 per policy year Limit of Liability.  2016–17 E&O Policy 1; 2018–19 E&O Policy 1; 2019–20 E&O Policy 1.  The E&O Policies provide:

> The Insurer shall pay on behalf of the Insureds that Loss resulting from any Claim if such Claim is first made against the Insureds during the Policy Period or the Extended Reporting Period, if applicable, for a Wrongful Act in the rendering or failing to render Professional Services.

2016–17 E&O Policy § I.  Under the E&O Policies, a "Claim" includes, in relevant part, "a written demand for monetary damages or non-monetary relief," or "a civil proceeding in a court of law or equity or arbitration."  *Id.* § II.

A "Wrongful Act" covered by the E&O policies includes "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted by the Insureds."  *Id.*  The Wrongful Act must be in the rendering or failure to render "professional services," which include:

> those services listed . . . , performed by or on behalf of the Insured for a policyholder or Client of the Insured pursuant to a written contract with such policyholder or Client for consideration inuring to the benefit of such Insured . . . [including] marketing, selling, or administration of travel assistance and protection benefit programs and event ticket protection programs.

---

[7] Like the EPS Policies, because Continental and Allianz renewed the 2016–17 E&O contracts without amendment (except as to policy limits), the Court cites to the original 2016–17 E&O Policy sections if such sections apply consistently to all E&O Policies.

*Id.* § I(A)(1).

Similar to the EPS Policies, the E&O Policies aggregate related matters under

"Interrelated Claims," which include:

> More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be considered as one Claim which shall be deemed to have been first made on the earlier of:
>
> a.     the date on which the earliest such Claim was first made, or
>
> b.     the first date valid notice was given by the Insureds to the Insurer under this Policy of any Wrongful Act or under any prior policy of any Wrongful Act or any fact, circumstance, situation, event or transaction which underlies any such Claim.

*Id.* § VI(4). The E&O Policies define Interrelated Claims as "any Wrongful Acts which are

logically or causally connected by reason of any common fact, circumstance, situation,

transaction or event" (the "E&O Policy Interrelated Claims Provisions"). *Id.* § II.

The E&O Policies contain two relevant exclusions. First, they exclude coverage for any

claim

> based upon or arising out of . . . liability of others assumed by an Insured under any contract or agreement; (including but not limited to any policy, contract or agreement of insurance, reinsurance, suretyship, annuity or endowment) . . . ; provided, however, that this exclusion shall not apply to the extent that liability would attach to an Insured in the absence of such contract or agreement

*Id.* § III(13) (the "Contractual Liability Exclusion").

Second, the E&O Policies also exclude coverage for "any Claim . . . based upon or

arising out of any actual or alleged: . . . unfair competition, dilution, deceptive trade practices,

[or] civil actions for consumer fraud" (the "Unfair Competition Exclusion"). 2016–17 E&O

Policy Endt. No. 12 §§ III(D) & IV(B); 2018–19 E&O Policy Endt. No. 11 §§ III(C) & IV(B);

2019–20 E&O Policy Endt. No. 16 §§ III(C) & IV(B).

Notably, the Policies limit coverage for a "Common Claim" submitted for coverage under both the 2016–17 EPS and E&O Policy to a "combined aggregated limit of liability under both policies in the amount of $10,000,000 and, if there is more than one (1) retention that applies, the single highest retention shall apply" (the "the Tie-in-Limits Endorsement"). 2016–17 E&O Policy Endt. No. 2. Common Claims must be "logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." *Id.*

### 2. Demands Asserted Against Allianz and the Underlying Class Actions

The Parties' dispute stems from nine underlying class action lawsuits (the "Underlying Class Actions") asserting eleven Claims for coverage: (1) seven Claims arising from putative class actions against Allianz's marketing partners (the "Kickback Indemnification Claims"); (2) two Claims arising from other putative class actions asserted directly against Allianz's marketing partners for other allegedly misleading or deceptive acts (the "Non-Kickback Indemnification Claims," and with the Kickback Indemnification Claims, the "Indemnification Claims"); and, (3) two Claims arising from the *Arencibia* action, in which Jefferson and Allianz Global are both named defendants along with Allianz's marketing partner (the "Direct Claims") (collectively, with the Kickback Indemnification and Non-Kickback Indemnification Claims, the "Claims").

### a. The Kickback Indemnification Claims

The Kickback Indemnification Claims involve the seven underlying class actions, from which Allianz's business partners assert Allianz has a duty to indemnify it pursuant to the marketing agreements between Allianz and each respective business partner. They are:

(1)     *Zamber v. American Airlines, Inc.*, No. 1:16cv23901 (S.D. Fla.) (the "*Zamber* Action"), (ECF No. 1-5), (Compl. ¶¶ 8–9);

(2)     *Donoff v Delta Airlines, Inc.*, No. 9:18cv81258 (S.D. Fla.) (the "*Donoff* Action"), (ECF No. 1-6), (Compl. ¶¶ 10–11);

(3)     *Dolan v. JetBlue Airways Corp*., No. 0:18cv62193 (S.D. Fla.) (the "*Dolan* Action"), (ECF No. 1-7), (Compl. ¶¶ 8–9);

(4)     *Flores v. United Airlines*, No. 18cv6571 (N.D. Ill.) (the "*Flores* Action), (ECF No. 1-8), (Compl. ¶¶ 12–13);

(5)     *Durkee v. Alaska Airlines*, No. 19cv1071 (S.D. Cal.) (the "*Durkee* Action"), (ECF No. 1-9), (Compl. ¶¶ 16–17);

(6)     *Salmons v. National Railroad Passenger Corp. (Amtrak)*, No. 19cv3253 (D.D.C.) (the "Salmons Action"), (ECF No. 25-2), (Am. Supp. Compl. ¶¶ 67–68, ECF No. 25); and,

(7)     *Smith v. Ticketmaster LLC et al.*, arbitration demand (the "*Smith* Action"), (ECF No. 25-3), (Am. Supp. Compl. ¶¶ 69–70).

For the indemnification demand arising from the *Zamber* Action, Allianz seeks coverage under the 2016–17 EPS Policy and 2016–17 E&O Policy.  (Am. Countercl. 19–20, ECF No. 26.) For the indemnification demands pursuant to the *Donoff*, *Dolan*, *Flores*, and *Durkee* Actions, Allianz seeks coverage under the 2018–19 EPS Policy and 2018–19 E&O Policy.  (*Id.* 20–23.) For the indemnification demands pursuant to the *Salmons*, *Smith*, *Foshee*, and *Arencibia* Actions, Allianz seeks coverage under the 2019–20 E&O Policy.  (*Id.* 23–27.)

### i.     The *Zamber* Action

On September 12, 2016, Kristian Zamber commenced a putative class action lawsuit against American Airlines, Inc. ("American") in connection with American's sale of travel insurance.  (*See* Compl. Ex. 5 "*Zamber* Complaint," ECF No. 1-5.)  The *Zamber* Action alleges, on behalf of all consumers who purchased travel insurance from American within the relevant time period, that "consumers have suffered, and will continue to suffer, as a result of American's deceptive practices relating to its presentation of trip insurance as a pass-through fee paid to an ostensibly independent third party insurer, when, in reality, it receives an undisclosed kickback

from every policy sold." (*Id.* ¶¶ 1, 43.)  The *Zamber* Action alleges that American's website states "[t]his insurance is offered by a third party, Allianz Global Assistance, <u>not American Airlines</u>. . . . Recommended by AGA Service Company, the licensed producer and administrator of this plan." (*Id.* ¶ 8 (emphasis in original).)

The *Zamber* Action states that American's website represents the trip insurance policy option as sold entirely by Allianz to "reinforce the representation of the trip insurance as a 'pass through' charge, one where American has no role in the provision of the product nor any profit interest." (*Id.* ¶¶ 32–34.)  For example, the *Zamber* Action alleges that American's website stated, "Trip insurance products are sold by third-party insurance providers, *not American*, so you'll receive a separate confirmation.  All policy documentation will be sent directly to you from the insurance providers." (*Id.* ¶ 33.)  The *Zamber* Action alleges, instead, that the "trip insurance program on [American's] website represents an illegal kickback scheme, one in which American deliberately hides its role and profit interest in the insurance policies sold on its website." (*Id.* ¶ 39.)

The *Zamber* Action originally asserted two causes of action:  (1) violation of Florida's unfair trade practices act; and, (2) unjust enrichment.  (*See id.* 15–16.)  Zamber eventually filed an amended complaint to add causes of action for violation of RICO, 18 U.S.C. §§ 1962(c) & (d), and Florida's state equivalent of the RICO statute.  (Allianz Am. Answer Ex. 2 "*Zamber* Amended Complaint" 21–30, ECF No. 26-2.)

In September 2016, Allianz gave notice to Continental of the *Zamber* Action and subsequently gave notice to Continental of American's indemnification demand to Allianz for the *Zamber* Action.  (Am. Countercl. ¶ 1.)  Allianz's Claim arising from the *Zamber* Action falls during the coverage period of the 2016–17 EPS and E&O Policies.  (Resp. 9.)

## ii.     The *Donoff* Action

On September 17, 2018, Judith Marilyn Donoff commenced a putative class action against Delta Air Lines, Inc. ("Delta") in connection with Delta's sale of travel insurance. (Compl. Ex. 6 "*Donoff* Complaint," ECF No. 1-6.)  The *Donoff* Action alleges that the Delta website "represents to the consumer that the party 'recommending' the purchase of insurance is [Allianz], not Delta" which "hide[s] Delta's financial interest in the purchase of trip insurance policies." (*Id.* ¶ 22.)  The *Donoff* Action further provides that "Delta proceeds to conceal its financial motivation in pushing the product by stating that a different entity— [Allianz]—is the entity recommending and brokering the trip insurance policies being sold on its website." (*Id.* ¶ 23.)  In fact, the *Donoff* Action asserts that Delta's website presented the travel insurance as recommended by Allianz. (*Id.* ¶ 24.)  Ultimately, the *Donoff* Action claims that "Delta retains or ultimately receives from Allianz an undisclosed kickback from every policy sold" by Allianz. (*Id.*)

Upon purchasing travel insurance from Delta, the *Donoff* Action alleges that "Allianz, not Delta, sends the consumer an email containing a copy of the purchased insurance policy." (*Id.* ¶ 38.)  The *Donoff* Action avers that "Delta having a role in the provision of the insurance" is notably absent from Allianz's email communication. (*Id.*)  The *Donoff* Action asserts causes of action for violation of the Florida's Unfair Trade Practices Act and unjust enrichment. (*Id.* 15– 16; *see also* Allianz Am. Answer Ex. 4 "*Donoff* Amended Complaint," ECF No. 26-4.)

On September 27, 2018, Allianz gave notice to Continental of the *Donoff* Action and Delta's indemnification demand pursuant to a marketing agreement. (Am. Countercl. ¶ 22.) Allianz's Claim arising from the *Donoff* Action falls during the coverage period of the 2018–19 EPS and E&O Policies. (Resp. 9.)

11

### iii.    The *Dolan* Action

On September 17, 2018, Milita Barbara commenced a putative class action lawsuit against JetBlue Airways Corp. ("JetBlue") in connection with JetBlue's sale of travel insurance.  The *Dolan* Action alleges that "JetBlue leaves the consumer with the false impression that the charge for trip insurance is a pass-through fee, *i.e.*, a fee that is passed on to another entity and for which JetBlue has no financial interest. . . . In reality, and despite lacking a license to broker insurance policies, JetBlue retains or ultimately receives an undisclosed kickback from every policy sold."  (Compl. Ex. 7 "*Dolan* Complaint" ¶ 1, ECF No. 1-7.)  Similar to the *Zamber* and *Donoff* Actions, the *Dolan* Action alleges that JetBlue markets trip insurance as "in the consumer's best interest—while hiding the fact that JetBlue is pushing the product because it is in its financial interest to general sales."  (*Id.* ¶ 18.)

The *Dolan* Action avers that JetBlue presented the insurance as recommended by Allianz, the "licensed producer and administrator" of the trip insurance plan.  (*Id.* ¶ 22.)  When purchasing trip insurance through the JetBlue website, "the consumer is told that he or she is purchasing the trip insurance from Allianz rather than JetBlue."  (*Id.* ¶ 30.)  Specifically, the website states, "By purchasing, you agree to Allianz Global Assistance's purchase agreement and privacy policy."  (*Id.*)  Allianz's email communication to consumers who purchased trip insurance from JetBlue's website allegedly failed to mention JetBlue's "role in the provision of the insurance."  (*Id.* ¶ 41.)

The *Dolan* Action asserts causes of action for violation of Florida's Unfair Trade Practices Act and unjust enrichment.  (*Id.* 16–17.)  Dolan subsequently amended her complaint to include causes of action for alleged federal RICO violations.  (Allianz Am. Answer "*Dolan* Amended Complaint" 20–25, ECF No. 26-5.)  The *Dolan* Amended Complaint alleges that

Allianz facilitates the above "scheme," not only by paying the purportedly improper "commissions," but also through the submission of false filings with state insurance regulators. (*Id.* ¶¶ 10, 12.)

On September 28, 2018, Allianz gave notice to Continental of the *Dolan* Action and JetBlue's indemnification demand pursuant to a marketing agreement.  (Am. Countercl. ¶ 30.) Allianz's Claim arising from the *Dolan* Action falls during the coverage period of the 2018–19 EPS and E&O Policies.  (Resp. 9.)

### iv.    The *Flores* Action

In the Amended Complaint, the *Flores* Action alleges that consumers who purchased trip insurance through United Airlines's ("United") website suffered as a result of United's "unfair practices relating to its presentation of the charge for trip insurance sold on its website and concealment of the fact that it is receiving an illegal kickback for selling that trip insurance." (Compl. Ex. 8 "*Flores* Amended Complaint" ¶ 1, ECF No. 1-8.)  The *Flores* Action asserts causes of action for violation of Illinois's consumer Fraud and Deceptive Business Practices Act, RICO violations, and unjust enrichment.  (*Id.* 14–23.)  Subsequently, Flores filed a Second Amended Complaint dropping the RICO count but continuing to allege that the "commissions" Allianz paid to United inflate the cost of the travel insurance and that "neither United nor its travel insurance partners disclose United's receipt of this excessive commission for soliciting travel insurance to Illinois state insurance regulators."  (Allianz Am. Answer Ex. 8 "*Flores* Second Amended Complaint" ¶ 2, ECF No. 26-8.)

On May 20, 2019, Allianz gave notice to Continental of the *Flores* Action and United's indemnification demand pursuant to a marketing agreement.  (Am. Countercl. ¶ 36.)  Allianz's

Claim arising from the *Flores* Action falls during the coverage period of the 2018–19 EPS and E&O Policies.  (Resp. 9.)

### v.   The *Durkee* Action

On June 7, 2019, Andrea Durkee commenced a putative class action lawsuit against Alaska Airlines, Inc. ("Alaska") in connection with Alaska's sale of travel insurance.  The *Durkee* Action alleges that Alaska "strongly encourages its passengers to purchase the travel insurance from its 'preferred provider,' Allianz Global Assistance . . . , a subsidiary of Allianz SE."  (Compl. Ex. 9 "*Durkee* Complaint" ¶ 1, ECF No. 1-9.)  The *Durkee* Action further alleges that at the point of purchase, the website gives the passenger the "false impression" that the insurance is a pass-through cost when, in fact, the price "is materially increased to fund payment of an undisclosed commission or kickback to Alaska."  (*Id.* ¶¶ 6–7.)  Additionally, the *Durkee* Action alleges that the "failure to disclose the remuneration it receives on the sale of travel insurance products purchased by Alaska passengers amounts to a deceptive and unfair trade practice, for Alaska's actions reasonably lead its passengers to believe that although payment is made through Alaska, the travel insurance product is being purchased from third-party AGA at a pass-through cost."  (*Id.* ¶ 25.)  The *Durkee* Action asserts causes of action for breach of fiduciary duty and violation of California's Unfair Competition Law.  (*Id.* 14–19.)

On June 28, 2019, Allianz gave notice to Continental of the *Durkee* Action and Alaska's indemnification demand pursuant to a marketing agreement.  (Am. Countercl. ¶ 41.)  Allianz's Claim arising from the *Durkee* Action falls during the coverage period of the 2018–19 EPS and E&O Policies.  (Resp. 9.)

### vi.    The *Salmons* Action

On October 29, 2019, Lisa Salmons commenced a putative class action lawsuit against National Railroad Passenger Corp. ("Amtrak") in connection with Amtrack's sale of travel insurance.  (Allianz Am. Answer Ex. 10 "*Salmons* Complaint" ¶ 1, ECF No. 26-10.)  The *Salmons* Action alleges that Amtrak's "website encourages ticket purchasers to protect their trip with travel insurance provided by Allianz" but "does not disclose, however, that it has a financial interest in the travel insurance and, in fact, receives an illegal kickback from the insurer in exchange for brokering the insurance sale."  (*Id.*)  The *Salmons* Action further alleges that Amtrack's "unfair and deceptive practices are likely to mislead—and have in fact misled—reasonable consumers."  (*Id.* ¶ 68.)  The *Salmons* Action asserts causes of action based on Amtrak's allegedly "deceptive conduct" for violation of the District of Columbia Consumer Protection Procedures Act, conversion, unjust enrichment, and fraudulent concealment.  (*Id.* 13–17.)

On February 21, 2020, Allianz gave notice to Continental of the *Salmons* Action and Amtrack's indemnification demand pursuant to a marketing agreement.  (Am. Countercl. ¶ 46.) Allianz's Claim arising from the *Salmons* Action falls during the coverage period of the 2019–20 E&O Policy.  (Resp. 9.)

### vii.    The *Smith* Action

On January 2, 2020, "Sarah Smith made a Demand for Arbitration in Los Angeles, California on behalf of herself and the general public against Ticketmaster, LLC and Live Nation Entertainment, Inc." (collectively, "Ticketmaster"), asserting claims under California law. (Resp. 5–6.)  The *Smith* Action concerns Allianz event protection insurance sold on the Ticketmaster and Live Nation websites.  (Allianz Am. Answer Ex. 11 "*Smith* Arbitration

Demand" ¶ 1, ECF No. 26-11.)  The *Smith* Action alleges that, "[d]espite not being licensed as insurance agents in any state, Respondents receive, directly or indirectly, insurance premiums and referral fees from the insurer in relation to each Event Protection Insurance policy sold to one of their ticket customers, including on Claimant's transactions."  (*Id.* ¶ 34.)  The *Smith* Action asserts that the website advertisement for the insurance is misleading and that "[a]s Claimant had already more than fully compensated Respondents for any services provided through the numerous service fees already charged as part of the ticket transactions, Claimant would not have elected to pay Respondents yet another fee in the form of a secret insurance commission, referral fee or kickback."  (*Id.* ¶ 42.)  The arbitration demand seeks public injunctive and declaratory relief that all event insurance contracts and any contracts between Allianz and Ticketmaster are void; for violation of California's Unfair Competition Law; for violation of California's Fair Advertising Law; unjust enrichment; and constructive trust to hold all fees for disbursement as the arbitrator deems just.  (*Id.* 21–32.)

On February 21, 2020, Allianz gave notice to Continental of the *Smith* Action and Ticketmaster's indemnification demand pursuant to a marketing agreement.  (Am. Countercl. ¶ 51.)  Allianz's Claim arising from the *Salmons* Action falls during the coverage period of the 2019–20 E&O Policy.  (Resp. 9.)

### b.       The Non-Kickback Indemnification Claims

The Non-Kickback Indemnification Claims involve two Underlying Class Actions, from which Allianz's business partners assert Allianz has a duty to indemnify it pursuant to the marketing agreements between Allianz and each respective business partner.

   (1)    *Foshee v. Delta Air Lines, Inc.*, No. 19cv612 (N.D. Fla.) (the "*Foshee* Action"), (ECF No. 26-12), (Am. Supp. Compl. ¶¶ 71–72); and,

16

(2)     *Arencibia v. AGA Service Co., et al.*, No. 19cv24300 (S.D. Fla.) (the "Arencibia Action"), (ECF No. 26-13), (Am. Supp. Compl. ¶¶ 73–74).

### i.     The *Foshee* Action

On December 19, 2019, Bonnie Foshee filed a class action challenging Delta's practice of selling "its customers' personal information to a third party for profit." (Allianz Am. Answer Ex. 12 "*Foshee* Complaint" ¶ 1, ECF No. 26-12.) The *Foshee* Action alleges that Delta "has engaged in unlawful schemes" and improperly sold customers' personal information to Allianz in connection with the purchase and sale of trip insurance through Delta's website. (*Id.*) The *Foshee* Action alleges that "Delta's conduct in selling its customers' Personal Information constitutes unfair or deceptive acts or practices in the conduct of trade or commerce, which is unlawful under FDUTPA." (*Id.* ¶ 14.) The *Foshee* Action asserts causes of action for violation of Florida Unfair Trade Practices Act, breach of contract, unjust enrichment, and bailment. (*Id.* 10–13.)

On February 21, 2020, Allianz gave notice to Continental of the *Foshee* Action and Delta's indemnification demand pursuant to a marketing agreement. (Am. Countercl. ¶ 56.) Allianz's Claim arising from the *Foshee* Action falls during the coverage period of the 2019–20 E&O Policy. (Resp. 9.)

### ii.     The *Arencibia* Action

On October 17, 2019, Ibaldo Arencibia filed a class action against Allianz alleging that Allianz misrepresents the coverage of its insurance plans to "enrich themselves at the expense of innocent consumers." (Allianz Am. Answer Ex. 13 "*Arencibia* Complaint" 2, ECF No. 26-13.) The *Arencibia* Action alleges that "a reasonable person, faced with Allianz's offer of insurance protection and coverage, would not think that the insurance he was purchasing was, in essence, extremely limited, applicable only to specific and unlikely named perils, such as

17

medical emergencies, illness, or catastrophic events."  (*Id.* ¶ 28.)  The *Arencibia* Action alleges

that American and insurer defendants are complicit in a "scheme to mislead unsuspecting

customers into purchasing this essentially empty 'insurance' coverage."  (*Id.* ¶ 31.)  The

*Arencibia* Action asserts claims for a declaration that the defendants wrongfully induced

purchases of trip insurance policy that voided the policy, and for unjust enrichment, violation of

Florida's Deceptive and Unfair Trade Practices Act, RICO, and false and misleading advertising.

(*Id.* 16–24.)

On February 21, 2020, Allianz gave notice to Continental of the *Arencibia* Action and

American's indemnification demand pursuant to a marketing agreement.  (Am. Countercl. ¶ 64.)

Allianz's Indemnification Claim arising from the *Arencibia* Action falls during the coverage

period of the 2019–20 E&O Policy.  (Resp. 9.)

### c.  <u>The Direct Claims</u>

Based on the *Arencibia* action, AGA and Jefferson also requested coverage under the

2019–20 E&O Policy for the direct claims asserted against them as defendants in the *Arencibia*

Action.  (*See Arencibia* Compl. 1.)

### B.  <u>Procedural Background</u>

On September 12, 2019, Continental brought this action for declaratory judgment.  (ECF

No. 1.)  On November 18, 2019, Allianz filed its Answer.  (ECF No. 10.)  At that time, Allianz

brought seven counterclaims against Continental, asserting four breach of contract claims

pursuant to the Policies at issue and requesting declaratory judgment.  (Allianz Am. Answer 23–

29, ECF No. 10.)

On February 7, 2020, Continental moved to file a Supplemental Complaint.  (ECF

No. 14.)  On March 11, 2020, Continental filed the Supplemental Complaint, (ECF No. 24),

pursuant to the Court's March 10, 2020 Order, (ECF No. 23).  On April 21, 2020, Allianz filed

its Amended Answer and Counterclaims against Continental, (ECF No. 26), and Continental

answered the Counterclaims, (ECF No. 27).

On May 19, 2020, Continental filed the Rule 12(c) Motion.  (ECF No. 28.)  On July 1,

2020, nearly two months later, Continental filed the Motion to Stay.  (ECF No. 33.)  In the

Motion to Stay, Continental seeks to stay discovery in the case until the Court resolves the

pending Rule 12(c) Motion and otherwise requests an initial pretrial conference in this matter.

(*Id.*)  Allianz responded to the Motions, (ECF Nos. 31, 36), and Continental replied, (ECF

Nos. 32, 37).

In the Complaint and Supplemental Complaint, Continental brings nine counts, seeking a

declaration in favor of the following:

| | | |
|---|---|---|
| (1) | **Count I:** | "the 2018–19 EPS Policy and 2018–19 E&O Policy do not afford coverage for the Airline Indemnification Claims, which constitute a single Claim under the 2016–17 EPS Policy and the 2016–17 E&O Policy," (Compl. 14–15); |
| (2) | **Count II:** | "the Tie-in-Limits Endorsement in the 2016–17 E&O Policy limits recovery for the 2016–17 Policy Period to a maximum combined limit of $10 million," (*id.* 16); |
| (3) | **Count III:** | "[t]he Contractual Liability Exclusion in the E&O Policies bars coverage for the Airline Indemnification Claims," (*id.* 16–17); |
| (4) | **Count IV:** | "Unfair Competition Exclusion in the E&O Policies bars coverage for the . . . Indemnification Claims," (*id.* 17); |
| (5) | **Count V:** | "Alternative declaration that the Tie-in-Limits Endorsement in the 2018–19 E&O Policy limits recovery for the 2018–19 Policy Period to a maximum combined limit of $10 million," (*id.* 18); |
| (6) | **Count VI:** | "[t]he Contractual Liability Exclusion in the 2019–20 E&O Policy bars coverage for the new indemnification demands," (Am. Supp. Compl. 10); |

19

(7)     **Count VII:**     "[t]he Unfair Competition Exclusion in the 2019–20 E&O Policy bars coverage for the new indemnification demands and the *Arencibia* action against AGA and Jefferson," (*id.* 10–11);

(8)     **Count VIII:**     "the 2019–20 E&O Policy does not afford coverage for the Amtrak Indemnification Claim or the Ticketmaster Indemnification Claim, which are part of a single Claim under the 2016–17 EPS Policy and the 2016–17 E&O Policy," (*id.* 11–13); and,

(9)     **Count IX:**     "the Unauthorized Use Exclusion in the 2019–20 E&O Policy bars coverage for the Delta Personal Information Indemnification Claim," (*id.* 13–14).[8]

The Counts can be distilled into three underlying arguments. First, Continental argues that the Kickback Indemnification Claims are barred from coverage by the Policies' "provisions confining coverage to a single policy period." (Mem. Supp. 12(c) Mot. 3, ECF No. 29.) Second, Continental argues that the Contractual Liability Exclusion precludes coverage for the Indemnification Claims because Allianz's marketing partners have sought indemnification from Allianz based on their marketing agreements. (*Id.*) Finally, Continental argues that the Unfair Competition Exclusion bars coverage for all demands made on Allianz because the demands stem from alleged violations of state deceptive and unfair trade practices statutes, RICO, and false advertising. (*Id.* 4.)

For the reasons that follow, the Court will grant the Rule 12(c) Motion in part as to Counts IV and VII, finding that the Unfair Competition Exclusion applies, at this procedural posture, only to those Claims "based on" alleged RICO violations. The Court will deny the Rule

---

[8] Continental does not argue the basis for Count IX in the 12(c) Motion. Generally, the Court need not consider arguments not raised in the motion at issue. *Cf. Mew Sporting Goods, LLC v. Johansen*, 992 F. Supp. 2d 665, 671 (N.D. W. Va. 2014), *aff'd*, 594 F. App'x 143 (4th Cir. 2015). When the Parties do not present argument to the Court, the Court may not "conjure up questions never squarely presented" to it. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). Therefore, the Court does not consider whether Allianz plausibly states that the Unauthorized Use Exclusion does not apply to the *Foshee* Action because the Parties do not address Count IX in the briefing before the Court.

12(c) Motion as lodged against all remaining Claims.  The Court will deny as moot the Motion to Stay.

## II.  Standards of Review

### A.  Motion for Judgment on the Pleadings:  Rule 12(c)

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)."  *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) (citing *City of Goldsboro*, 178 F.3d at 243).  "A Rule 12(c) motion for judgment on the pleadings therefore is also analyzed for compliance with the Supreme Court's holdings in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)."  *U.S. v. Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d 111, 115 (D.D.C. 2015) (citations omitted).

"It is axiomatic . . . that for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false."  5C ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2019) (citing cases). Similar to a Rule 12(b)(6) motion, the Court must view all "the inferences to be drawn [from the facts] in the light most favorable to the nonmoving party."  *Id.*  "To survive a motion for judgment on the pleadings, a pleading need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what . . . the claim is and the grounds upon which it rests."  *Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d at 115 (citing *Twombly*, 550 U.S. at 555)

(internal quotation marks omitted).  A court may consider the interpretation of an insurance policy for summary resolution because the construction of an insurance policy functions involves a question of law.  *See, e.g.*, *Lessard v. Cont'l Cas. Co.*, No. 1:14cv64, 2014 WL 4162006, at *2 (E.D. Va. Aug. 19, 2014).

### B.    Insurance Contract Interpretation Under Virginia Law

As with other contracts under Virginia law,[9] the Court will interpret an insurance policy "in accordance with the intention of the parties gleaned from the words they have used in the document.  Each phrase and clause of an insurance contract 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done.'" *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (quoting *Floyd v. Northern Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)).  "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning."  *Id.* (quoting *Barber v. VistaRMS, Inc.*, 634 S.E.2d 706, 712 (Va. 2006)).  "Words that the parties used are normally given their usual, ordinary, and popular meaning.  No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."  *Id.* (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 628 S.E.2d 539, 542 (Va. 2006)).

---

[9] The Parties properly agree that the Court must analyze the insurance policies pursuant to Virginia contract law.  *See Klein v. Verizon Commc'ns, Inc.*, 674 F. App'x 304, 307–08 (4th Cir. 2017) (finding that a federal court sitting in diversity must apply the choice-of-law provisions of the state in which it sits, and that under Virginia law "lex loci contractus [or the law of the place of the contract] serves as the default rule"); *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) (finding that under Virginia state law, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage").  Allianz confirms that "all of the subject insurance policies were delivered to [Allianz] in Virginia, [therefore] the law of [Virginia] applies."  (Resp. 13 n.13.)

"Virginia law draws a distinction between the burden of proof for proving coverage and the burden of proof for demonstrating the applicability of an exclusion in an insurance policy." *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 689–90 (E.D. Va. 2017). First, "the insured bears . . . [the] burden to establish a *prima facie* case that coverage should be triggered. In other words, the burden is on the policyholder at the outset to bring himself within the terms of the policy." *Id.* "Virginia has long followed the rule that if the insured fails to fulfill a condition of an insurance policy, the insurer's coverage obligation is not triggered." *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 660 F.3d 827, 830 (4th Cir. 2011) (citations omitted). Second, "[o]nce the policyholder makes out a *prima facie* case, the burden shifts to the insurance company to prove an affirmative defense," which includes policy exclusions. *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011) (citation omitted).

In determining whether the policyholder and the insurance company have met their burdens of proof, Virginia law requires the reviewing court to apply certain inferences. Specifically,

> [i]nsurance policies are contracts whose language is ordinarily selected by insurers rather than by policy-holders. The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed most[] strongly against the insurer.

*TravCo Ins. Co.*, 736 S.E.2d at 325 (quoting *PBM Nutritionals, LLC v. Lexington Ins., Co.*, 724 S.E.2d 707, 713 (Va. 2012)). In accordance with this standard of review, "it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." *SunTrust Mortg.*, 800 F. Supp. 2d at 731 (citation omitted).

23

However, when no ambiguity exists "there is no reason for applying the rules of contra proferentem[10] or liberal construction for the insured." *TravCo Ins. Co.*, 736 S.E.2d at 325 (quoting *PBM Nutritionals*, 724 S.E.2d at 713). "[A]n insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language." *Id.* (quoting *PBM Nutritionals*, 724 S.E.2d at 713). When the terms of the policy are clear, the Court need not look to decisions from other jurisdictions to interpret the policy. *See id.* at 324.

### III.  Analysis

To repeat, Continental lodges three arguments against coverage for Allianz's claims: (1) the Kickback Indemnification Claims are barred from coverage by the Policies' "provisions confining coverage to a single policy period;" (2) the Contractual Liability Exclusion precludes coverage for the Indemnification Claims because Allianz's marketing partners have sought indemnification from Allianz based on the marketing agreements between Allianz and those partners; and, (3) the Unfair Competition Exclusion bars coverage for all demands made on Allianz because the Claims stem from alleged violations of state deceptive and unfair trade practices statutes, RICO, and false advertising. (Mem. Supp. 12(c) Mot. 3–4.)

The Court reviews the Counts in the Complaint and Supplemental Complaint as they fall under Continental's three arguments. First, the Court finds that Allianz plausibly alleges that the Kickback Indemnification Claims do not share a "sufficient factual nexus" to fall under the Related or Interrelated Claims Provisions as to make them one Claim for coverage. Because the Tie-in-Limits Endorsement follows the same definition, the Tie-in-Limits Endorsement also does

---

10 "Contra Proferentem" is "[t]he doctrine that, in the interpretation of documents, ambiguities are to be construed unfavorably to the drafter." Contra Proferentem, BLACK'S LAW DICTIONARY (11th ed. 2019).

not apply.  Therefore, when viewed in a light most favorable to Allianz, the Kickback

Indemnification Claims, in a light most favorable to Allianz, are not subject to the Tie-in-Limits

Endorsement cap of $10,000,000 for the 2016–17 policy year.

Next, the Court reviews the two E&O Policies' exclusions.  Here, the Court finds that

Allianz plausibly alleges that the Contractual Liability Exclusion does not apply because it could

be held liable on the underlying conduct.  In contrast, the Court finds that the Unfair Competition

Exclusion applies under the E&O Policies unambiguous terms to the Underlying Class Actions

that are "based on" alleged RICO violations.  After drawing all reasonable inferences in

Allianz's favor, the Unfair Competition Exclusion bars coverage only under the E&O Policies

for those Indemnification and Direct Claims "arising out of" Underlying Class Actions that

assert claims for alleged RICO violations:  the *Zamber*, *Dolan*, and *Arencibia* Actions.

### A.   Counts I, II, V, and VIII:  Allianz States a Claim That the Kickback Indemnification Claims Do Not Share a "Sufficient Factual Nexus" to Fall Under the Related or Interrelated Claims Provisions or the Tie-in-Limits Endorsement

Drawing all reasonable factual inferences in Allianz's favor, the Court finds that Allianz

plausibly alleges that the Kickback Indemnification Claims do not fall under the EPS Policy

Related Claim Provisions nor the E&O Policy Interrelated Claims Provisions, and therefore, do

not constitute Common Claims subject to the combined aggregated limit of liability.[11]

---

[11] Continental argues that the Kickback Indemnification Claims amount to Related or Interrelated Claims so that they qualify under the Tie-in-Limit Endorsement.  The Tie-in-Limit Endorsement dictates that all Common Claims submitted under both the E&O Policy and EPS Policy are subject to an aggregate policy limit of $10 million.  Thus, by arguing that the Kickback Indemnification Claims amount to Related or Interrelated Claims, Continental seeks to cap its total liability for all Kickback Indemnification Claims to $10 million.

The Kickback Indemnification Claims encompass seven class actions from which Allianz's marketing partners seek indemnification for allegations of improper insurance kickbacks.  Those class actions are the *Zamber*, *Donoff*, *Dolan*, *Flores*, *Durkee*, *Salmons*, and *Smith* Actions.  Allianz seeks coverage for the *Zamber* Action under the 2016–17 EPS and E&O

The EPS and E&O Policies treat all Related or Interrelated Claims as a single Claim within the policy period that the insured first makes its claim, subjecting the Interrelated Claims to that policy's aggregate limit of liability.  Under the EPS Policies, Related Claims include "all Wrongful Acts that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision."  2016–17 EPS Policy § II.  Under the E&O Policies, Interrelated Claims include "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event" (the "E&O Policy Interrelated Claims Provisions").  2016–17 E&O Policy § II.  Courts typically find this language to be unambiguous.  *See Bryan Bros. Inc. v. Cont'l Cas. Corp.*, 704 F. Supp. 2d 537, 543 (E.D. Va. 2010), *aff'd*, 660 F.3d 827, 830 (4th Cir. 2011) (finding "all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice, or decision" unambiguous).  Because no ambiguity exists, the Court will construe the Interrelated Claims Provisions "according to [their] plain meaning."  *TravCo Ins. Co.*, 736 S.E.2d at 325 (citation omitted).

Reading in a light most favorable to Allianz, the Court finds that Allianz plausibly alleges that the Kickback Indemnification Claims[12] are not "logically or causally connected" by any

---

Policies.  For the indemnification demands pursuant to the *Donoff*, *Dolan*, *Flores*, and *Durkee* Actions, Allianz seeks coverage under the 2018–19 EPS and E&O Policies.  Finally, Allianz seeks coverage under the 2019–20 E&O Policy only for the indemnification demands pursuant to the *Salmons*, *Smith*, *Foshee*, and *Arencibia* Actions.

[12] Drawing all reasonable inferences in Allianz's favor, the Court agrees that, under the Policies' definitions, the Claims at issue are the indemnification demands arising from the underlying lawsuits and the direct claims against Jefferson and AGA in the *Arencibia* Action.  Specifically, a "Claim first made" against the Allianz triggers coverage under the Policies.  The Policies define a Claim, under the EPS Policies, as "a written demand . . . for monetary or non-monetary relief," *see* 2016–17 EPS Policy § II, and under the E&O Policies as "a written demand for monetary damages or non-monetary relief," *see* 2016–17 E&O Policy § II.  Nevertheless, the Court finds the distinction between the Claims and the Underlying Class Action of no moment to

"sufficient factual nexus" to qualify them as Related or Interrelated Claims.  *See W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 177 (4th Cir. 2016).  "In general, courts have found claims to be interrelated when they have a common nexus of facts and arose out of the same occurrence of wrongful acts."  *ACE Am. Ins. Co. v. Ascend One Corp*., 570 F. Supp. 2d 789, 801 (D. Md. 2008).  The Kickback Indemnification Claims[13] involve a number of different factual circumstances, including:  (1) different AGA partners; (2) different websites through which insurance was sold; (3) different named plaintiffs; (3) different putative classes; (4) different factual and legal claims; (5) different damages; and, (6) different state laws. Although the Claims need not "involve precisely the same parties, legal theories, Wrongful Acts, or requests for relief," the Court finds distinguishable those cases in which courts have found a "sufficient factual nexus" between two claims.  *See Zunenshine v. Exec. Risk Indem., Inc.*, 182 F.3d 902, 1999 WL 464988, at *2 (2d Cir. June 29, 1999) (quotation marks and brackets omitted).

By way of comparison, the United States Court of Appeals for the Fourth Circuit Continental does not argue, and the Court could not otherwise find, that the Non-Kickback Indemnification Claims and Direct Claims qualify as Related or Interrelated Claims along with the Kickback Indemnification Claims.  The Non-Kickback Indemnification Claims and Direct

---

the discussion of related or interrelatedness, finding Allianz's underlying conduct insufficient to form a "sufficient factual nexus" at this procedural posture.  *See W.C. & A.N. Miller Dev. Co.*, 814 F.3d at 177.

[13] Continental does not argue, and the Court could not otherwise find, that the Non-Kickback Indemnification Claims and Direct Claims qualify as Related or Interrelated Claims along with the Kickback Indemnification Claims.  The Non-Kickback Indemnification Claims and Direct Claims lack the improper kickback allegation on which Continental grounds its Related and Interrelated Claim argument.  Without the common business practice, the analysis below would fall further beyond a finding of relatedness or interrelatedness for the Non-Kickback Indemnification and Direct Claims.

Claims lack the improper kickback allegation on which Continental grounds its Related and Interrelated Claim argument.  Without the common business practice, the analysis below would fall further beyond a finding of relatedness or interrelatedness for the Non-Kickback Indemnification and Direct Claims.

By way of comparison, the Fourth Circuit ruled in *Stewart Engineering, Inc. v. Continental Casualty Co.* that the collapse of two bridges constituted "related claims" despite the collapses occurring at different times and causing different injuries because the claims about the bridges shared a number of important common facts, including:

> a single contract for the design of both bridges, the same Project Manager and Project Engineer worked on the design of both bridges, and, crucially, the same design flaw caused the collapse of both bridges.  Moreover, a miscommunication between the Project Manager and the Project Engineer responsible for both bridges led to [plaintiff's] failure to detect and correct the common design flaw.

751 F. App'x at 395.  Similarly, in *Zunenshine v. Executive Risk Indemnification, Inc.*, the United States Court of Appeals for the Second Circuit found two lawsuits had a "strong factual nexus" where both lawsuits alleged "four of the same six plaintiffs made virtually identical false statements in reports, press releases, and other public statements" during the same time period, despite involving "different parties and somewhat different legal harms."  182 F.3d 902, 1999 WL 464988, at *2 (2d Cir. June 29, 1999).  In contrast, the Kickback Indemnification Claims at bar arise from (among other things) different contracts, marketing partners, websites, and damages.  Allianz's alleged kickbacks for insurance sales cannot be distilled into essentially the same misstatements as in *Zunenshine*.  Here, the only commonality among the Kickback Indemnification Claims is one of Allianz's general business practices as opposed to, for example, the same underlying facts, misstatements, transactions, or events.  *See id.*

28

Also, although the Kickback Indemnification Claims may involve similar conduct, continuing conduct alone does not carry the day.  Continental, in support of the Rule 12(c) Motion, argues that the Kickback Indemnification Claims share a common scheme wherein Allianz's marketing partners concealed their financial motivation regarding the sale of Allianz's insurance on their websites, causing harm such as inflated insurance prices.  (Mem. Supp. 12(c) Mot. 22.)  In *ACE American Insurance Company v. Ascend One Corporation*, the United States District Court for the District of Maryland found that claims arising out of similar business practices were not so interrelated where the claims were different "in time and factual specifics" from the underlying litigation at issue.  570 F. Supp. 2d at 801 (reasoning that to label defendant-insured's business practices such as those here as interrelated "would preclude coverage for any claim against [defendant-insured] based on how it provides business services because the Interrelated Wrongful Acts exclusion would always apply to such claims").

Similarly, in *Glascoff v. OneBeacon Midwest Insurance Company*, the United States District Court for the Southern District of New York found two claims did not share a sufficiently "common nexus" where, "[i]f painted in broad strokes, the two Claims may [have] arise[n] out of the same deficient corporate structure or Plaintiff's lack of oversight."  No. 13cv1013, 2014 WL 1876984, at *6 (S.D.N.Y. May 8, 2014) ("it would be hard to envision, given the broad allegations . . . how any subsequent claim against Plaintiffs would not [then] be deemed an Interrelated Wrongful Act.").

At this juncture, reading in a light most favorable to Allianz, the Kickback Indemnification Claims do not fall under the Related or Interrelated Claims Provisions.  The Kickback Indemnification Claims are not "logically or causally connected" by the same parties; demands; legal theories or harms; or underlying facts, other than the sole allegation that Allianz

29

had a practice of providing improper insurance kickbacks to each marketing partner.[14]  *See* 2016–17 EPS Policy § II; 2016–17 E&O Policy § II.  As such, the Court finds that the Tie-in-Limits Endorsement does not apply.  The Polices reveal, and the Parties agree, that the Tie-in-Limits Endorsement requires the same logical "connect[ion] by reason of any common fact, circumstance, situation, transaction, or event" as the Related and Interrelated Claims definitions. 2016–17 E&O Policy Endt. No. 2.  As such, the Tie-in-Limits Endorsement rises and falls on the same analysis as the Related and Interrelated Claims Provisions.  and that the Kickback Indemnification Claims are not limited to an aggregated limit of liability.  In sum, the Court denies the Rule 12(c) Motion as lodged against Counts I, II, V, and VIII.

---

[14] Finding otherwise would essentially exclude most, if not all, claims made against Allianz.

**B.      Counts III and VI:  Allianz States a Claim That the Contractual Liability Exclusion Does Not Apply to the Indemnification Claims[15]**

Because Allianz plausibly alleges that it could be held individually liable for the conduct underlying the Indemnification Claims, the Court concludes the Contractual Liability Exclusion does not apply to the Indemnification Claims.[16]

The Contractual Liability Exclusion under the E&O Policies bars coverage for any claim "based upon or arising out of . . . liability of others assumed by an Insured under any contract or agreement; (including but not limited to any policy, contract or agreement of insurance, reinsurance, suretyship, annuity or endowment) . . . ; provided, however, that this exclusion shall not apply to the extent that liability would attach to an Insured in the absence of such contract or agreement."  2016 E&O Policy § III(13).

When interpreting similar language, courts have typically found that the exclusion "is inapplicable if the insured would be liable for the loss in the absence of the contract or

---

[15] Continental argues that the E&O Policies' Contractual Liability Exclusion bars the Indemnification Claims from coverage.  The Indemnification Claims implicate nine Underlying Class Actions:  (1) the seven Kickback Indemnification Claims from the marking partners named in the *Zamber*, *Donoff*, *Dolan*, *Flores*, *Durkee*, *Salmons*, and *Smith* Actions; and, (2) the two Non-Kickback Indemnification Claims from the marketing partners named in the *Foshee* and *Arencibia* Actions.  Allianz seeks coverage for the Kickback Indemnification Claims under the 2016–17 and 2018–19 EPS and E&O Policies and the 2019–20 E&O Policy.  For the Non-Kickback Indemnification Claims, Allianz seeks coverage only under the 2019–20 E&O Policy.

[16] Allianz argues that Continental's assertion of the Policies' exclusions—both the Contractual Liability Exclusion and the Unfair Competition Exclusion—are premature affirmative defenses at this procedural juncture.  (Resp. 23.)  Under the Rule 12(b)(6) standard applicable to Rule 12(c) motions, a Rule 12(c) motion "generally cannot reach the merits of an affirmative defense."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).  Nevertheless, the Court may reach the merits of an affirmative defense "if all facts necessary to the affirmative defense clearly appear on the face of the complaint."  *Id.* (emphasis omitted).  Because the applicability of the exclusions rests on the Policies' terms and the attached underlying class actions, the "facts necessary" to resolve the applicability of the exclusions "clearly appear" in the present record.  *Id.*

agreement." *Credit Gen. Ins. Co. v. Abateco Servs., Inc.*, 11 F. App'x 47, 51 (4th Cir. 2001) (per curiam) (internal quotations and citations omitted).  In other words, "the exclusion does not destroy coverage for the insured's own negligence, even that stemming from the insured's negligent performance of a contract." *Id.*  "Liability under the policy depends upon the nature of the liability of the insured, not upon the manner in which the claim for liability has been enforced." *U.S. Fid. & Guar. Co. v. Va. Eng'g Co.*, 213 F.2d 109, 112 (4th Cir. 1954).

Continental urges nonetheless the Court to exclude the Indemnification Claims from coverage because Allianz's marketing partners seek recovery pursuant to the marketing agreements.  (Mem. Supp. 12(c) Mot. 27.)  This cannot prevail, though, because the Indemnification Claims each allege a "scheme" between Allianz and its marketing partner such that Allianz could be held directly liable for the underlying conduct.

Generally, the Kickback Indemnification Claims implicate Allianz's business practice of selling insurance on its marketing partner's websites and distributing improper kickbacks for insurance purchases as described in the underlying lawsuits.  For example, the *Zamber* Action charges that American's website states "[t]his insurance is offered by a third party, Allianz Global Assistance, <u>not American Airlines</u>. . . . Recommended by AGA Service Company, the licensed producer and administrator of this plan."  (*Zamber* Compl. ¶ 8 (emphasis in original).)  As such, the *Zamber* Action alleges that the "trip insurance program on [American's] website represents an illegal kickback scheme, one in which American deliberately hides its role and profit interest in the insurance policies sold on its website."  (*Id.* ¶ 39.)  The *Flores* Action, in the Second Amended Complaint, alleges that Allianz uses the "commissions" paid to United to inflate the cost of the travel insurance and that "neither United nor its travel insurance partners

disclose United's receipt of this excessive commission for soliciting travel insurance to Illinois state insurance regulators."  (*Flores* Second Am. Compl. ¶ 2.)

Continental itself asserts that the Kickback Indemnification Claims "allege that the marketing partners conceal their receipt of the[] 'commissions' because they are prohibited from *receiving* them as unlicensed insurance brokers."  (Mem. Supp. 12(c) Mot. 22 (emphasis added).) All seem to agree that the Claims assert Allianz allegedly issued the improper kickbacks integral to the Kickback Indemnification Claims, taking them outside the Contractual Liability Exclusion.

Further, the class actions underlying the Kickback Indemnification Claims suggest a direct claim could be brought against Allianz based on Allianz's disclosures when transmitting the insurance policy to the consumer.  For example, the *Donoff* Action avers that "Delta having a role in the provision of the insurance" is notably absent from Allianz's email communication. (*Donoff* Compl. ¶ 38.)  Similarly, the *Dolan* Action alleges that "the consumer is told that he or she is purchasing the trip insurance from Allianz rather than JetBlue."  (*Dolan* Compl. ¶ 30.) Specifically, the *Dolan* Action describes JetBlue's website as stating, "By purchasing, you agree to Allianz Global Assistance's purchase agreement and privacy policy."  (*Id.*)  After purchasing travel insurance, the *Dolan* Action similarly alleges that Allianz's email communication to consumers who purchased trip insurance from JetBlue's website fails to mention JetBlue's "role in the provision of the insurance."  (*Id.* ¶ 41.)

The Non-Kickback Indemnification Claims also each allege some kind of joint "scheme" between Allianz and its marketing partner that would allow Allianz to be held directly liable. For example, the *Foshee* Action alleges that Delta "has engaged in unlawful schemes" to improperly sold customers' personal information to Allianz in connection with the purchase and

sale of trip insurance through Delta's website.  (*Id.*)  The *Arencibia* Action also alleges that American and insurer defendants are complicit in a "scheme to mislead unsuspecting customers into purchasing this essentially empty 'insurance' coverage."  (*Arencibia* Compl. ¶ 31.)  Notably, the *Arencibia* Action names AGA and Jefferson in the suit, giving rise to the two Direct Claims in the instant matter.  (*Id.* 1.)

Although Allianz's marketing partners demand indemnification pursuant to the marketing agreements, liability under the policy does not depend "upon the manner in which the claim for liability has been enforced."  *U.S. Fid. & Guar. Co.*, 213 F.2d at 112.  Because Allianz plausibly states a claim that it could be held liable for the alleged "schemes" in underlying the class actions, the Court finds that the Contractual Liability Exclusion does not apply.  Therefore, the Court denies the Rule 12(c) Motion lodged against Counts III and VI.

### C.    Counts IV and VII:[17]  The Unfair Competition Exclusion Applies Only to the Underlying Class Actions Arising from RICO Allegations

Drawing all reasonable inferences in Allianz's favor, the Court finds that the Unfair Competition Exclusion excludes coverage for Claims "arising out of" the *Zamber*, *Dolan*, and *Arencibia* Actions because they are "based on" alleged RICO violations.  Otherwise, doubt exists as to the scope of the Unfair Competition Exclusion, particularly where the ordinary and accepted meaning of its terms overlap with the E&O Policies' coverage for "misstatements,"

---

[17] Continental argues that the Unfair Competition Exclusion bars all claims from coverage under the E&O Policies because they arise out of "unfair competition, dilution, deceptive trade practices, [or] civil actions for consumer fraud."  *See* 2016–17 E&O Policy Endt. No. 12 §§ III(D) & IV(B); 2018–19 E&O Policy Endt. No. 11 §§ III(C) & IV(B); 2019–20 E&O Policy Endt. No. 16 §§ III(C) & IV(B).

"misleading statements," and "omissions" regarding the "marketing, selling, or administration of travel assistance and protection benefit programs."[18]  2016–17 E&O Policy §§ I(A)(1) & II.

The Unfair Competition Exclusion under the E&O Policies excludes coverage for "any Claim . . . based upon or arising out of any actual or alleged: . . . unfair competition, dilution, deceptive trade practices, [or] civil actions for consumer fraud" (the "Unfair Competition Exclusion").  2016–17 E&O Policy Endt. No. 12 §§ III(D) & IV(B); 2018–19 E&O Policy Endt. No. 11 §§ III(C) & IV(B); 2019–20 E&O Policy Endt. No. 16 §§ III(C) & IV(B).

### 1.       <u>Legal Standard:  Construing the Unfair Competition Exclusion</u>

Under Virginia law, the Court will construe a contract according to its plain meaning "when the terms in a contract are clear and unambiguous." *TravCo Ins. Co.*, 736 S.E.2d at 325 (citation omitted).  If so, the Court affords the words used by the parties "their usual, ordinary, and popular meaning." *Id.* (citation omitted).  Ambiguity exists in a contract when its terms are subject to more than one reasonable interpretation.  *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).  A Court may use extrinsic evidence only to resolve ambiguous terms in the contract.  *Schneider v. Continental Cas. Co.*, 989 F.2d 728, 731 (4th Cir. 1993).

---

[18] The Court sees the possibility of overlap because the EPS Policies contain the same Unfair Competition Exclusion as the E&O Policies.  Yet, the EPS Policies provide coverage under the Media Liability provision for Wrongful Acts through "the dissemination or utterance of Matter" that result in "unfair competition or unfair trade practices . . . including but not limited to dilution, confusion, deceptive trade practices or unfair trade practices, civil actions for consumer fraud, false, disruptive or misleading advertising or misrepresentation in advertising." *Compare* 2016–17 EPS Policy § II, *with*, *id.* § III(Q) (excluding "unfair competition, dilution, deceptive trade practices, civil actions for consumer fraud or false or deceptive advertising or misrepresentation in advertising" along with violations of RICO).  Continental does not argue that the EPS Policies exclude coverage under this identical unfair competition exclusion.  Because the Court recognizes the risk of overlap, at this stage it will construe the Unfair Competition Exclusion strongly in favor of granting coverage.  *TravCo Ins. Co.*, 736 S.E.2d at 325.

As to the language of an exclusion, "the insurer is required to use language that clearly and unambiguously defines the scope of the exclusions." *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 331 (Va. 2000). The Court should enforce an exclusion "only when [it] 'unambiguously bring[s] the particular act or omission within its scope.'" *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 242 (4th Cir. 1995). Therefore, "the burden rests with the insurer to establish the clear applicability of a particular exclusion from coverage." *Id.* "The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it." *TravCo Ins. Co.*, 736 S.E.2d at 325. Thus, "[l]anguage in a policy purporting to exclude certain events from coverage will be construed most[] strongly against the insurer." *Id.*

Relevant to the Unfair Competition Exclusion, courts typically find that "[t]he phrase 'arising out of' is not itself ambiguous and has a plain meaning that is not difficult to discern." *Trex Co., Inc. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 576 (E.D. Va. 2002) (citing *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of N. Am.*, 501 F. Supp. 136, 138 (W.D. Va. 1980) (applying Virginia law)). "Indeed, the Fourth Circuit has held that the use of the phrase 'arising out of' . . . clearly indicated an intent that the release be broadly construed and not be strictly limited to the listed released claims." *Id.* ("In the insurance context 'arising out of' is broader than 'caused by,' and ordinarily means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' or 'incident to or having connection with.'" (citation omitted)). The "arising out of" language "require[s] a causal connection between a particular fact or source of law and an essential element of the cause of action alleged." *Minn. Lawyers Mut. Ins. Co. v. Protostorm*, 197 F. Supp. 3d 876, 884 (E.D. Va. 2016).

**2.      The Unfair Competition Exclusion Unambiguously Applies to the
Claims Arising From RICO Allegations**

As a threshold matter, the Court must first decide whether the Unfair Competition

Exclusion is "clear and unambiguous." *TravCo Ins. Co.*, 736 S.E.2d at 325.  Courts typically

find that "[t]he phrase 'arising out of' is not itself ambiguous and has a plain meaning that is not

difficult to discern." *Trex Co., Inc.*, 234 F. Supp. 2d at 576.  Relevant to the Underlying Class

Actions,[19] the exclusion for "any violation of . . . the Racketeer Influenced and Corrupt

Organizations Act" does not present any ambiguities (the "RICO Exclusion").  *See World-Wide*

*Rights*, 955 F.2d at 245.  Because the Claims "arising out of" the *Zamber*, *Dolan*, and *Arencibia*

Actions implicate RICO allegations, the Court finds that a "causal connection" between

Allianz's conduct and "an essential element" of the RICO allegations exists sufficient to exclude

these Claims from coverage under the Unfair Competition Exclusion.  *Minn. Layers Mut. Ins.*

*Co.*, 197 F. Supp. 3d at 884.

**3.      Because Doubt Remains as to the Unfair Competition Exclusion's
Meaning After Giving Undefined Terms Their Common and
Accepted Meaning, the Unfair Competition Exclusion Does Not Apply
to the Non-RICO Claims**

The Court finds, after construing the language in favor of granting coverage, that the

Unfair Competition Exclusion does not apply to the Non-RICO Claims.

The Court must review whether the Unfair Competition Exclusion is "clear and

unambiguous" beyond the RICO Exclusion.  *TravCo Ins. Co.*, 736 S.E.2d at 325.  Although

---

[19] Allianz argues that the Unfair Competition Exclusion cannot implicate the counts at
issue in the Underlying Class Actions.  The Fourth Circuit instructs that the language "arising out
of" must "be broadly construed and not be strictly limited."  *Trex Co., Inc.*, 234 F. Supp. 2d at
576.  Therefore, because the Indemnification Claims are "causal[ly] connected" to the
Underlying Class Actions, the Unfair Competition Exclusion must consider the allegations at
issue in the Underlying Class Actions.  *See Minn. Layers Mut. Ins. Co.*, 197 F. Supp. 3d at 884.

courts typically find that "[t]he phrase 'arising out of' is not itself ambiguous and has a plain meaning that is not difficult to discern," *Trex Co., Inc.*, 234 F. Supp. 2d at 576, Allianz argues that the E&O Policies coverage for "misstatements," "misleading statements," and "omissions" regarding the "marketing, selling, or administration of travel assistance and protection benefit programs" is ambiguous insofar as it conflicts with the Unfair Competition Exclusion. (Resp. 28.)

Read favorably to Allianz and because the E&O Policies do not define "misstatements," "misleading statements," and "omissions," "the term[s] must be given [their] ordinary and accepted meaning." *Lower Chesapeake Assocs.*, 532 S.E.2d at 331 (using the dictionary definition to find the "ordinary and accepted meaning" of a policy term). The ordinary meaning of "misstatement" per the Merriam-Webster Dictionary is "to state incorrectly, give a false account of." *Misstatement*, MERRIAM-WEBSTER DICTIONARY. It follows that a "misleading" statement amounts to a statement "possessing the capacity or tendency to create a mistaken understanding or impression." *Misleading*, MERRIAM-WEBSTER DICTIONARY. Lastly, the ordinary meaning of omission includes "something neglected or left undone" and "apathy toward or neglect of duty." *Omission*, MERRIAM-WEBSTER DICTIONARY.

The Court must also apply the "ordinary and accepted meaning" to additional language of the Unfair Competition Exclusion because the E&O Policies do not define "unfair competition," "deceptive trade practices," or "consumer fraud." *Lower Chesapeake Assocs.*, 532 S.E.2d at 331. Typically, "unfair competition" refers to trademark violations, similar to those implicated in the Lanham Act. *See Nationstar Mortg., LLC v. Ahmad*, 155 F. Supp. 3d 585, 592 (E.D. Va.

2015).[20]  Otherwise, the Court looks to the Virginia Code, as the law that applies to the Policies at issue, to interpret "deceptive trade practices" and "consumer fraud."  *See Klein*, 674 F. App'x at 307–08.

Title 38.2 of the Virginia Code governs Unfair Trade Practices in the insurance industry. Chapter 5, covering "Unfair Trade Practices," prohibits as "False Information" the dissemination of any "representation or statement relating to (i) the business of insurance or (ii) any person in the conduct of his insurance business, which is untrue, *deceptive or misleading*."  Va. Code § 38.2-503.  As to "consumer fraud," the Virginia Consumer Protection Act "makes it unlawful for any supplier in connection with a consumer transaction to commit the 'fraudulent acts or practices . . . [of] using any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535, 553 (E.D. Va. 2001) (citing Va. Code § 59.1-200(A)(14)).

Despite giving the E&O Policy's terms their ordinary and accepted meaning, the Court struggles to discern any difference between coverage for "misstatements," "misleading statements," and "omissions" and the Unfair Competition Exclusion for "deceptive trade practices," or "consumer fraud."  Read in a light most favorable to Allianz, both deceptive trade practices and consumer fraud require some kind of "misrepresentation," a term almost indistinguishable from the ordinary and accepted definitions of "misstatement" or "misleading

---

[20] The Black's Law Dictionary definition presents a similar interpretation of "unfair competition," as:

> [a] term which may be applied generally to all dishonest or fraudulent rivalry in trade and commerce, but is particularly applied in the courts of equity (where it may be restrained by injunction) to the practice of endeavoring to substitute one's own goods or products in the markets for those of another . . . .

Unfair Competition, BLACK'S LAW DICTIONARY (11th ed. 2019).

statement."  Under Virginia law, "the insurer is required to use language that clearly and unambiguously defines the scope of the exclusions."  *Lower Chesapeake Assocs.*, 532 S.E.2d at 331.  Because doubt exists as to the meaning of the language of the exclusion, the Court will interpret the exclusion "most[] strongly against the insurer" and "in favor of that interpretation which grants coverage."  *TravCo Ins. Co.*, 736 S.E.2d at 325.

Because the Court should only enforce an exclusion "when the exclusion[] 'unambiguously bring[s] the particular act or omission within its scope,'" *Fuisz*, 61 F.3d at 242, the Court finds that the Unfair Competition Exclusion does not preclude coverage for the remaining Claims that do not "aris[e] out of" a RICO violation.

### D.    The Court Denies as Moot the Motion to Stay

On July 7, 2020, Continental filed the Motion to Stay, seeking to stay discovery in the case until after the Court resolves the Rule 12(c) Motion and requests an initial pretrial conference in this matter.  (Mem. Supp. Mot. Stay 1, ECF No. 34.)  Upon Allianz's filing of its Answer, the Court will schedule the initial pretrial conference in this case.  Therefore, the Court denies as moot the Motion to Stay.

### IV.  Conclusion

For the foregoing reasons, the Court will grant the Rule 12(c) Motion as to Counts IV and

VII, finding that the Unfair Competition Exclusion bars those Claims "arising out of" a class

action "based on" RICO.  The Court will deny the Rule 12(c) Motion as to all remaining Counts.

The Court will deny as moot the Motion to Stay.

An appropriate Order shall issue.


 

                                /s/

                      M. Hannah Lauck
                      United States District Judge

Date:  March 31, 2021
Richmond, Virginia

41